Anthony W. Merrill (#022598)
Amanda Z. Weaver (#034644)
John Habib (#037431)
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:   602.382.6000
Facsimile:   602.382.6070
Email: amerrill@swlaw.com
       aweaver@swlaw.com
       jhabib@swlaw.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| International Society for the Protection of Mustangs and Burros, a non-profit organization, and Betty Nixon, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> United States Government, Department of Agriculture, Brooke L. Rollins, as the acting Secretary of Agriculture, United States Forest Service, Tom Schultz, as Chief of the U.S. Forest Service, and Joshua Miller, as acting Forest Supervisor, and Does 1 through 10, <br><br> Defendants. | No. 3:26-cv-08092-KML <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **(Oral Argument Requested)** |

SNELL & WILMER

4922-9530-4615

**INTRODUCTION**

A preliminary injunction is crucial here because the U.S. Forest Service ("USFS") is permitting the impoundment, removal, and disposal of federally protected wild horses found in, near, or around the Heber Wild Horse Territory ("HWHT," or the "Heber Herd") in the Apache-Sitgreaves National Forests ("ASNF"), starting on or before April 27, 2026—despite a Stipulation that the USFS entered into over twenty years ago with Plaintiff International Society for the Protection of Mustangs and Burros ("ISPMB") for almost identical violations of federal law, following USFS's attempts to improperly remove the *same* federally protected wild horses—and in disregard of the Parties' present April 27, 2026 Joint Stipulation (Doc. 19). These wild horses once again require immediate federal court intervention and protection to prevent the USFS's actions that will irreparably destroy the family bands that compose the Heber Herd and will result in federally protected wild horses sold to locations where slaughter is legal.

The USFS's proposed actions exceed its lawful authority on at least <u>two</u> grounds: <u>First</u>, the USFS undertook a legally deficient administrative process culminating in a Final Territory Management Plan ("Final TMP") and Finding of No Significant Impact ("FONSI") that violates (a) the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706; (b) the Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse and Burro Act" or "the Act"), 16 U.S.C. §§ 1331-1340; (c) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370j; and (d) the 2007 Stipulated Settlement Agreement entered in the United States District Court for the District of Arizona, Case No. CV-05-2754-PHX-FJM. The Final TMP's actions are ongoing and will irreparably damage and/or destroy the Heber Herd.

<u>Second</u>, in direct contravention the Final TMP (and thumbing its nose at nearly 20 of judicial and public involvement with the Heber Herd), the USFS flippantly issued a letter (Dkt. # 2-1, **Ex. A**) on April 9, 2026 ("April 2026 Letter"),[1] incompatibly asserting without

---

[1] This letter was dated and signed by Acting Forest Supervisor Joshua Miller on March 9, 2026, but was not posted on the USFS's website until April 9, 2026. (B. Nixon Decl., ¶ 11.)

4922-9530-4615

support that the horses currently present on the ASNF are not "wild free-roaming horses," but instead "unauthorized livestock" allegedly introduced after 1971 and subject to impoundment, and published its "Notice of Intent to Impound Unauthorized Livestock" (the "Notice") in the White Mountain Independent, threatening to impound (and then remove) "any unbranded livestock" "on or after April 27, 2026." (Dkt. # 2-1, **Ex. B**.)  These actions, with no legal or factual support, attempt to circumvent and reconsider the fundamental legal status of the Heber Herd and abandon the Wild Horse & Burro Act's framework, which requires the government to protect wild horses "from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, *as an integral part of the natural system of public lands*." 16 U.S.C. § 1331 (emphasis added). Despite this already flawed impending deadline, Plaintiffs understand and/or have personally witnessed third parties beginning to round up known wild horses the evening of April 21, 2026, claiming verbal authorization from the USFS. (B. Nixon Decl., ¶¶ 7, 9.) These third-party roundups continue to date. (*Id.*, ¶ 10.) Additionally, the USFS is currently failing to investigate or enforce against these third-parties even when reported. (*Id.*) The USFS—and any third parties it has either (a) authorized; or (b) failed to protect the horses from—must be immediately stopped.

A Preliminary Injunction is necessary to preserve the status quo pending judicial review. If round-ups, by either the USFS, or by third parties (without USFS intervention or federally required preventative enforcement) are allowed to continue before these issues are fully and fairly resolved, Plaintiffs will suffer immediate and irreparable harm:  namely, the horses will permanently be removed from the public lands of the ASNF with their natural family bands and herd groups disrupted and likely forever destroyed—this falls woefully below the Forest Service's obligation and duty to protect wild free-roaming horses under the 1971 Act. These horses cannot be replaced. No amount of money could compensate for the devastation that will result from failing to grant the requested injunction. Plaintiffs further request that this Court issue an Order to Show Cause why a preliminary injunction should not be issued restraining Defendants from rounding up any horses in the ASNF, and

- 2 -

prevent third parties from doing the same.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Factual Background

Plaintiff ISPMB is a non-profit organization formed for the purpose of furthering the protection and preservation of wild horses and burros. ISPMB has spent decades advocating for, studying, and enjoying the wild free-roaming horses found on the National Forest Lands in Arizona, including those found on the Apache-Sitgreaves National Forests. (K. Sussman Decl., ¶ 5.) Plaintiff Betty Nixon in an individual residing in Overgaard, Arizona, who has lived there for the past seven and a half years. (B. Nixon Decl., ¶ 5.) For the last seven and a half years, Ms. Nixon has dedicated approximately 25-30 hours per week to observe, track, and advocate for the horses in the ASNF (*Id.*) She gathers significant aesthetic and recreational enjoyment from observing, watching, and surveying these horses, particularly in observing and learning from their behaviors as the only wild horse herd that has not had interference by the U.S. Forest Service via capturing, birth control, removals, or roundups, at least for decades. (*Id.*, ¶ 6; K. Sussman Decl., ¶ 6.) Her significant enjoyment comes from observing their behaviors in family bands and noting how they interact within those natural bands, and with other family bands in the ASNF. (*Id.*)

The USFS's current actions follow years of administrative proceedings that included ignoring its prior obligations. ISPMB sued the USFS in 2005 seeking a preliminary injunction and alleging that the Forest Service had not conducted a census, inventory, or any other type of survey to determine how many horses were "wild free-roaming." In March 2007, ISPMB and the USFS entered into a Stipulation (*see* Dkt. # 1-1, **Ex. B**), which required the USFS to, inter alia, (1) develop a TMP with public involvement before gathering or removing horses in the Heber Wild Horse Territory, as well as on the Black Mesa and Lakeside Ranger Districts; (2) provide ISPMB with specific notice of the document; and (3) consider ISPMB's comments on the Territory Management Plan. (*Id.*) In particular, the USFS agreed that "the Heber Wild Horse Territory still exists and has not been dissolved" and that "wild horses are by law an integral part and component of the

- 3 -

4922-9530-4615

natural system of the public lands." (*Id*.)

The USFS issued a Draft TMP and Draft Environmental Assessment ("EA") in 2021. (Verified Compl., ¶ 45.) In response, ISPMB submitted comments which raised USFS's improper limitation of territory boundaries, an arbitrary Appropriate Management Level determination, a mischaracterization of the herd's historical presence, a lack of reliable census data, and a failure to explicitly recognize the herd as "wild free-roaming." (*Id*., ¶ 46.) With the publication of the 2025 Final TMP and EA, ISPMB again submitted public comments which identified many of the same concerns raised in 2021. (*Id*., ¶¶ 48-51.)

The USFS's Final TMP and FONSI are legally deficient. It relied on an EA when it should have pursued an Environmental Impact Statement, it ignored extensive public comment, failed to conduct a lawful inventory, and adopted unsupported and internally inconsistent population assumptions.

Yet the USFS has now moved outside even that flawed administrative framework. Through its April 2026 Letter and subsequent April 10, 2026 Notice, the agency has reclassified the horses as "unauthorized livestock" and asserted authority to immediately impound, remove, sell, or destroy them under a separate regulatory regime. This action is not supported by, disclosed in, or analyzed as part of the Final TMP, Final EA, or FONSI, and was never subjected to public comment or environmental review.

Plaintiffs have acted diligently and promptly upon learning of the Forest Service's intent to proceed with horse removal activities upon issuance of the April 2026 Notice. Furthermore, after learning of the impending roundup activity and witnessing third parties acting, upon information and belief, on USFS authorization to begin rounding up wild horses (on the evening of April 21, 2026), Plaintiffs filed a Verified Complaint the next morning requesting additional relief in the form of injunctive relief along with an Application for a Temporary Restraining Order and Preliminary Injunction. Plaintiffs further incorporate by reference the allegations set forth in their Verified Complaint.

On April 27, 2026, Plaintiffs and Defendants entered a stipulated agreement under which Defendants agreed:  (1) No non-privately-owned horse may be removed from the

- 4 -

Black Mesa and Lakeside Ranger District on the ASNF without compliance with applicable state and federal law; (2) All non-privately-owned horses are subject to all provisions and protections of the Wild Horse and Burro Act; and (3) Federal law prohibits causing or allowing the inhumane treatment or harassment of and the unauthorized removal or attempted removal of any wild horse from the ASNF by third parties, subject to criminal penalties. (Doc. 19.) Most importantly, Defendants agreed to implement the Wild Horse and Burro Act, investigate reports of violations in the ASNF, and, in the event of a violation, pass along relevant information to appropriate law enforcement for further investigation. This is the bare minimum necessary to meet Defendants' obligations under the law, and must be continued—and strengthened—pending this Court's decision on the merits.

## II. Plaintiffs Meet the Legal Standard for a Preliminary Injunction.

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the Plaintiff is entitled to such relief," which is unquestionably the case here. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The standards for evaluating a request for a temporary restraining order and a preliminary injunction are the same. *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 490-91 (9th Cir. 2023). The relevant factors that Plaintiffs have established here are: (1) that Plaintiffs are likely to succeed on the merits; (2) absent the requested relief, Plaintiffs are likely to suffer irreparable harm; (3) the balance of equities tips in Plaintiff's favor; and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 20. All four factors are met here.

Plaintiffs also meet the "serious questions" test in balancing the above four factors, which provides that a preliminary injunction is appropriate where serious questions exist relative to the merits of the case, the balance of hardships tips sharply towards Plaintiff and the remaining two elements have been met. *See Alliance For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-1132 (9th Cir. 2011).

## III. A Preliminary Injunction Is Necessary and Justified.

Defendants' planned and ongoing roundup of horses from the ASNF violates (a) the APA, 5 U.S.C. §§ 701-706; (b) the Wild Horse and Burro Act, 16 U.S.C. §§ 1331-1340;

- 5 -

(c) NEPA, 42 U.S.C. §§ 4321-4370j; and (d) the 2007 Stipulated Settlement Agreement entered in the United States District Court for the District of Arizona, Case No. CV-05-2754-PHX-FJM. The USFS has violated these provisions on two different grounds for which Plaintiffs are likely to succeed on the merits, and which raise serious questions.

First, the Final TMP purports to manage wild horses under a structured NEPA framework, including an Appropriate Management Level of 50-104 horses. (*See* Dkt. # 2-1, **Ex. C**, at 7; Dkt. # 2-5, ¶ 4.) The Final TMP and FONSI fail to meet the USFS's obligations under federal law and its prior Stipulation with ISPMB. And, while any management pursuant to the TMP is deficient, the USFS's second strategy of incorrectly categorizing federally protected wild horses as "unauthorized livestock" allows for immediate and wholesale removal without regard to AML, statutory protections, or the procedural safeguards required under NEPA and the Wild Horse and Burro Act. Having failed to justify removal through a lawful administrative process, the agency now attempts to accomplish the same by circumventing the legal process with a different mechanism. The unauthorized livestock designation operates as a backdoor attempt to remove the horses while avoiding the legal deficiencies inherent in the final TMP process.

A. Plaintiffs Are Likely to Succeed on the Merits and Raise Serious Questions.

1. Violation of the Administrative Procedures Act

Agency action must be set aside where it is arbitrary, capricious, fails to examine relevant data, or fails to articulate a satisfactory explanation for its action. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *see also* 5 U.S.C. § 706(2)(A) (reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law). The Final TMP must be set aside because it rests on unsupported assumptions, ignores contrary evidence, defers essential analysis to speculative future "adaptive management," and disregards binding settlement obligations. Plaintiffs' likelihood success on the merits includes at least the following four reasons.

First, the Forest Service set an AML of 50-104 horses based on a forage analysis that

4922-9530-4615

assumes wild horses are confined to the Territory boundaries. (Dkt. #2-1, **Ex. C**, at 16-17.) This assumption is factually wrong and legally impermissible. The Wild Horse and Burro Act mandates that horses be protected in a manner that preserves their "free-roaming behavior." 43 C.F.R. § 4700.0-6(c); 16 U.S.C. § 1331. The forage analysis itself is further flawed because it relies on an arbitrarily selected and temporally inconsistent dataset. Specifically, forage conditions from 2007, 2008, and 2018 to generate an "average." (Dkt. #2-1, **Ex. C.**, at 41; Dkt. # 2-5, ¶ 4.). But these years are neither consecutive nor representative of current conditions, and notably it includes data points from periods proximate to the 2002 Rodeo-Chediski Fire, which significantly altered vegetation and habitat conditions within the Territory. The agency provides no reasoned explanation for excluding more recent and ecologically relevant data in favor of decades-old conditions, rendering the analysis outdated and unrepresentative of present forage availability. The Forest Service's AML determination adopts an annual population growth rate of 20% derived from the WinEquus model. (Dkt. #2-1, **Ex. C**, at 42; Dkt. # 2-5, ¶ 4.) But actual observed behavior of the Heber Herd has demonstrated a growth rate of approximately 3% over the past two decades. (Dkt. #2-1, **Ex. D**, at 9-10; Dkt. # 2-5, ¶ 5.) If the WinEquus projections were accurate, the Heber Herd population today should number in the thousands, but instead their growth has been slow and stable. An agency model that artificially constrains horses to a boundary produces a forage calculation that systematically undermines that land's actual carrying capacity. An AML built on that flawed foundation cannot survive review.

Second, the BLM Handbook H-4700-1 establishes a minimum genetic viability threshold of 150-200 horses. (See Dkt. #2-2, **Ex. E**, at 22; Dkt. # 2-5, ¶ 6.) The Forest Service set an AML of 50-104 horses, knowingly below that threshold, without providing any binding genetics plan to prevent inbreeding depression or genetic collapse. Setting a management level that an agency's own governing handbook identifies as genetically nonviable, without explanation or mitigation, is arbitrary and capricious on its face.

Third, the Forest Service's determination that horses must be removed presupposed

- 7 -

an accurate count of how many horses are actually present in the Territory. Yet as demonstrated by the Forest Service's own response to ISPMB's May 2024 FOIA request, the agency has failed to produce documentation supporting its population claims. (Dkt. #1-1, **Ex. C**.) An agency determination to remove animals from their historic range cannot rest on a population estimate the agency cannot substantiate.

Finally, the USFS's April 2026 Letter is an unexplained and unlawful ignoring of its obligations under the APA (and other law, *infra*). The Forest Service is abruptly attempting to reclassify the horses on the ASNF as "unauthorized livestock," without appropriate support and improperly using that as the trigger to either immediately impound horses or to fail to enforce the protections to which the Heber Herd is entitled.

### 2. Violations of the Wild Horse and Burro Act

Congress enacted the Wild Horse and Burro Act upon finding that wild horses and burros "are living symbols of the historic and pioneer spirit of the West," and that they contribute to the diversity of life forms within this Nation. 16 U.S.C. § 1331.

The horses of the HWHT are entitled to every protection the Act affords. Evidence establishes that wild horses have lived in the ASNF as far back as 1910. (*See* Dkt. #2-1, **Ex. D**, at 4; Dkt. # 2-5, ¶ 5.) The Act defines "wild free-roaming horses" as "all unbranded and unclaimed horses . . . on public lands of the United States." 16 U.S.C. § 1332(b). The unbranded and unclaimed horses on the ASNF satisfy this definition and are entitled to the Act's full protections. The Forest Service's attempt to recharacterize these animals as "unauthorized livestock" or "strays" subject to impoundment, disposal, and unenforced third-party gathers or harassment is not just wrong — it is unlawful.

The Forest Service's Final EA states that horses will be managed consistent with the Act but conspicuously fails to expressly recognize the Heber Herd as wild free-roaming horses under 16 U.S.C. § 1332. (Dkt. #2-1, **Ex. C**, at 8; Dkt. # 2-5, ¶ 4.). The Act expressly requires that wild horses be managed where presently found. 16 U.S.C. § 1331. The Forest Service violated this mandate by restricting its management framework to arbitrary territorial boundaries that do not reflect the Heber Herd's historical or current range.

- 8 -

4922-9530-4615

Before managing (let alone removing) wild free-roaming horses, the Act requires the Secretary to "maintain a current inventory of wild-free roaming horses and burros on given areas of the public lands." 16 U.S.C. § 1333(b). The USFS has not done so. As demonstrated by its own response to ISPMB's May 2024 FOIA request, the agency cannot produce documentation supporting its population claims. (Dkt. #1-1, Ex. C.) The USFS authorized the removal of horses from their historic range without documenting a reliable inventory of how many horses are present, whether they are wild or domestic, branded or unbranded, or what their age and condition may be, and has authorized impoundment of all horses on the ASNF as "unauthorized livestock." These violate the Act.

### 3. Violations of the National Environmental Policy Act

NEPA establishes a national policy for the environment through which it seeks to promote, among other things, the preservation of "important historic, cultural, and natural aspects of our national heritage and maintain, wherever possible, an environment which supports diversity, and variety of individual choice." 42 U.S.C. § 4331(b)(4). NEPA specifically requires preparation of an Environmental Impact Statement ("EIS") for major federal actions significantly affecting the quality of the human environment. Federal actions, upon which the Final EA was expressly dependent (*see* Dkt. #2-2, **Ex. F**, at 9; Dkt. # 2-5, ¶ 7.), were defined to include activities "subject to substantial Federal control and responsibility," including the "adoption of formal plans… which prescribe alternative uses of Federal resources, upon which future agency actions will be based," the "[a]doption of programs…to implement a specific policy or plan," and the "[a]pproval of or carrying out specific agency projects, such as a construction or management activities located in a defined geographic area." 40 C.F.R. § 1508.1(w)(1) (2025). The USFS's Final TMP fits squarely within this definition as it is a formal agency plan prescribing the capture, removal and sale of wild horses living within the ASNF. It is, without question, a major federal action requiring full NEPA compliance. Yet rather than prepare the required EIS, the Forest Service concluded that the Final EA was appropriate since the Final TMP would not have significant effects on the quality of the human environment when considering the context

and intensity of the impact. (*See* Dkt. #2-2, **Ex. F**, at 13; Dkt. # 2-5, ¶ 7.)

The Final TMP describes a permanent, multi-generational management regime that includes (1) setting an Appropriate Management Level of 50-104 horses (Dkt. # 2-1, **Ex. C**, at 7; Dkt. # 2-5, ¶ 4.); (2) authorizing the capture and removal of all horses exceeding that AML beginning further from the territory and progressively moving closer until the population is reduced to 104 horses (*id.*); (3) deploying helicopters to drive horses into traps, with contractors authorized to rope, restrain, and transport animals (*id.*, at 10); (4) administering fertility control agents on a regular and reoccurring basis; and (5) establishing permanent holding facilities within the National Forest. (*Id.*, at 11.)

While the above all violate NEPA, the April 2026 Letter confirms that the Forest Service is not even implementing the action it analyzed under NEPA. Rather than managing wild horses under a structured management plan, the agency pivoted to impounding "unauthorized livestock." NEPA requires agencies to analyze the environmental consequences of the action they actually intend to take. The impoundment, sale, or destruction of animals under the framework presented in the April 2026 Letter presents a materially different environmental, ecological, and cultural impact than those evaluated in the final EA. None of those impacts were disclosed or analyzed.

### 4. Violation of the 2007 Joint Stipulation

Plaintiff ISPMB previously (successfully) sued the USFS for its violations of law in the for its treatment concerning the Heber Herd in 2005, alleging that the Forest Service had not conducted a census, inventory, or any other type of survey to determine how many horses in the territory were wild free-roaming horses. This Court agreed with ISPMB and first restrained, then enjoined the USFS from capturing and transporting horses outside of the ASNF. In 2007, ISPMB and the USFS entered into a Stipulation under which the USFS agreed that it will refrain from any gathering or removing of horses within the ASNF until the Forest Service completes a Territory Management Strategy. (*See* Dkt. #1-1, **Ex. B**.) The Forest Service has still not conducted a thorough census or inventory in order to determine how many horses in the ASNF are wild free-roaming. (*See, e.g.*, Dkt. #2-2, **Ex. F;** Dkt.

4922-9530-4615

#2-5, ¶ 7.) Their Final TMP and FONSI violate the 2007 Stipulation.[2] In 2005, the agency represented that at least 300 horses were at issue. (Dkt. # 2-2, **Ex. I**.) The agency has since claimed that only approximately 120 "trespass horses" were subject to removal under the Stipulation. (Dkt. #2-1, **Ex. C**, at 2; Dkt. # 2-5, ¶ 4.) The Forest Service has provided no explanation for this dramatic revision, nor has it reconciled these conflicting figures with its current assertions of herd overpopulation—claims for which it also does not have support. (*See* Dkt. #1-1, **Ex. C** (USFS's June 14, 2024 response to FOIA request, admitting no records responsive to support claims of "more than 1,000" animals and other claimed figures of wild horse populations).

These continued inconsistencies are fatal. Agencies may not invoke settlement agreements while simultaneously ignoring their express limitations. Because the Forest Service's proposed actions exceed the scope and factual predicates of the 2007 Stipulation, Plaintiffs are likely to prevail on its claim that the agency is acting ultra vires.

Authorizing a round-up under these circumstances risks recreating the very harm the 2007 Stipulation was intended to prevent:  the irreversible removal of potentially protected wild horses before the legality of the agency's actions can be meaningfully reviewed. At a minimum, the USFS's current course of action presents serious questions as to whether the agency has cured the defects that necessitated injunctive relief in the first instance.

The USFS's current authorization of immediate removal expressly violates the Stipulation. To be sure, the Stipulation was adopted to prevent the premature capture and removal of horses in the absence of lawful environmental review and a reliable determination of the horses' legal status under the Wild Horse and Burro Act—precisely what the USFS now seeks to do. Indeed, Plaintiffs have substantial reason to believe that the same unresolved factual uncertainties persist today, particularly that the USFS is treating horses in the ASNF as "unauthorized livestock" and subjecting them to removal without

---

[2] The USFS continues to wrongly rely on disputed and internally inconsistent historical population figures (figures that were central to the prior litigation and never reconciled through a lawful inventory) to justify current population modeling, growth-rate assumptions, and the asserted need for immediate removals.

- 11 -

4922-9530-4615

first making a lawful, horse-by-horse determination of their status as unbranded and unclaimed horses protected under federal law.

The April 2026 Letter reclassification also raises serious concerns under the 2007 Stipulation. That agreement was designed to prevent precisely this type of premature removal in the absence of a lawful determination of the horses' status. By now asserting that the horses are "unauthorized livestock," the agency is attempting to circumvent both the Stipulation and the statutory protections it is obligated to enforce. The Forest Service now seeks to conduct removals based on fundamentally different factual premises than those underlying the Stipulation. The USFS is attempting to rely on similar factual premises that the current horses on the HWHT are "unauthorized livestock," which was rebutted by affidavit and found by this Court to have "de minimis" evidentiary value. (Dkt. # 1-1, **Ex. A**, at 5).

These multiple violations raise serious questions and establish that Plaintiffs are likely to succeed on the merits.

B.     Plaintiffs Will Suffer Irreparable Harm Absent Relief.

A Preliminary Injunction is crucial here because the April 10, 2026 Notice authorizes imminent and irreversible harm that cannot be remedied after the fact. The Notice provides that "any unbranded livestock…may be impounded without further notice," that impounded animals not redeemed within five days "will be offered for sale at public auction," and that animals not sold may be "sold at private sale or condemned and destroyed or otherwise disposed of." These provisions create an immediate pathway for the removal and permanent destruction of the Heber Herd on an *expedited* timeline.

Indeed, the removal of congressionally protected wild horses constitutes irreparable harm as a matter of law. (*See* Dkt. # 1-1, **Ex. A**, at 5 (*ISPMB et al. v. USFS.*, No. CV-05-2754-PHX-FJM (D. Ariz. 2007) (Order granting preliminary injunction)).) Once horses are captured and removed from the ASNF, the harm will be complete and irreversible:  family bands are permanently disrupted, genetic diversity is diminished, and horses are forever separated from the public lands Congress specifically set aside for their protection. (K.

- 12 -

4922-9530-4615

Sussman Decl., ¶ 7.) Plaintiff Nixon and others who are personally dedicated to observing, tracking, and advocating for horses in the ASNF will also be irreparably harmed, given the disruption that will occur to the family bands in the ASNF. (*Id.*; B. Nixon Decl., ¶ 6.) Indeed, with reference to the purpose of the Wild Horse and Burro Act, the harm is irreparable. Even if horses could theoretically be returned, the ecological, behavioral, and genetic harm caused by forced removal cannot be restored. (K. Sussman Decl., ¶ 7.) *See National Wildlife Federation v. National Marine Fisheries Services*, 886 F.3d 803, 818 (9th Cir. 2018).

The USFS's proposed actions threaten to deprive Plaintiffs of guaranteed procedural and substantive protections. The loss of these protections, particularly the right to informed decision-making before irreversible action occurs, constitutes irreparable harm independent of the physical removal itself. Once the USFS acts without complying with mandatory statutory requirements, no subsequent judicial ruling can restore the opportunity for meaningful review or undo the violation. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("[When environmental] injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

The threatened harm is imminent. The Forest Service has claimed authority to proceed with removal operations despite the 2007 Stipulation and individuals who have expressed an expectation of—or actual verbal—authorization from the Forest Service have been preparing for a roundup with a catch pen supplied with hay and mineral block, and have subsequently loaded a stock trailer with a family band Plaintiff Nixon is familiar with as part of the Heber Herd. (*See* B. Nixon Decl., ¶¶ 7-9.) Once a roundup commences with official USFS approval, judicial intervention becomes futile. The horses will have been captured, removed, or dispersed beyond the Court's ability to provide meaningful relief.

The impoundment and removal of wild horses will permanently destroy the Heber Herd's social structure. Wild horses exist in stable family bands with defined hierarchies, including dominant stallions, mares, and offspring. (K. Sussman Decl., ¶ 5.) Once horses are captured and removed through mass impoundment, these family units are irretrievably

SNELL & WILMER

- 13 -

broken. (*Id*.) There is no mechanism to reconstitute these social structures after dispersal. (*Id*.) Horses will be sold into channels where upon reasonable belief, they will be slaughtered. (*Id*., ¶ 8.) The Notice explicitly authorizes public auction within five days and permits subsequent private sale or destruction of animals that are not sold. (Dkt. # 2-2, **Ex. B**.) Once horses enter commercial sale streams, they cannot be tracked or recovered, and many will likely ultimately be transported to locations where slaughter is lawful. The loss of these animals is permanent and cannot be undone through monetary or equitable relief. Also, once removed, horses will no longer exist as part of the ecosystem in which they developed and to which they contribute. The ecological and cultural value of a free-roaming herd cannot be replicated by relocated or confined animals.

The agency's actions are poised to occur imminently, before this case can be fully adjudicated. Under these circumstances, a Preliminary Injunction is the only mechanism capable of preserving the status quo and the Court's ability to render effective relief, up until and including a preliminary injunction. No adequate remedy at law exists for the harms Plaintiffs seek to prevent. Monetary damages cannot compensate for the permanent loss of wild horses from their congressionally designated territory or the destruction of an established herd structure, social bonds, and genetic integrity.

The April 2026 Letter purports to provide the legal predicate for treating the horses as "unauthorized livestock," while the April 10, 2026 Notice operationalizes that determination by authorizing immediate seizure, sale, or destruction. The Notice provides that any unbranded livestock may be impounded without further notice. This enforcement regime creates an imminent and irreversible risk that the very horses the Forest Service previously treated as protected wild horses will be permanently removed, sold, or destroyed before this Court can review the legality of the agency's actions.

1. The Balance of Equities Tips Sharply in Plaintiff's Favor.

The balance of equities weighs decidedly in Plaintiffs' favor. The harm Plaintiff seeks to prevent is permanent and irreversible, while the requested relief merely preserves the status quo and imposes only a brief administrative delay on the Forest Service.

- 14 -

4922-9530-4615

Absent a Preliminary Injunction, Plaintiff faces the imminent removal of protected wild horses from the Heber Wild Horse Territory, an injury that cannot be undone. The capture, relocation, or removal of wild horses permanently alters herd structure, genetic composition, and the ecological integrity of the congressionally designated territory.

The Forest Service, by contrast, faces no comparable harm from a brief postponement of removal operations. A Preliminary Injunction would not require the agency to abandon its management objectives, relinquish statutory authority, or foreclose future action. It would simply require the Forest Service to refrain from taking irreversible adverse action until the Court can evaluate the lawfulness of the agency's conduct, and otherwise require it to comply with the Wild Horse and Burro Act and regulations.

Courts have found that when the harms faced are permanent, the balance of equities tips in favor of the party facing permanent harm. *See League of Wilderness Defenders/Blue Mountain Biodiversity project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014); *id*. ("If such [irreparable environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." (citation omitted)). Here, Plaintiffs face permanent environmental injury while the government faces mere delay—a paradigmatic case for equitable relief.

The fundamental purpose of a preliminary injunction is to preserve the status quo pending judicial resolution. The status quo here is the continued presence of wild horses within the HWHT under existing management conditions. Granting relief would maintain that status quo. Denying relief would allow the Forest Service to fundamentally and irreversibly alter it by removing horses before the Court can determine whether such action is lawful. Any USFS interests do not outweigh the permanent harm Plaintiffs seek to prevent, particularly where the agency's claimed urgency rests on disputed population figures and unsubstantiated management assumptions that are the subject of this litigation.

Any administrative burden is largely of the agency's own making. The Forest Service has been aware of the legal and factual disputes surrounding HWHT management for years—including in direct litigation with ISPMB beginning over 20 years ago.

- 15 -

4922-9530-4615

### 2. A Preliminary Injunction is in the Public Interest.

Courts have recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, having suspended such projects until consideration occurs and comports with the public interest. *See Cottrell*, 632 F.3d at 1138. Granting a Preliminary Injunction is in the public interest because it will preserve congressionally protected public resources, ensure agency compliance with federal law, and safeguard the integrity of judicial review.

The public interest is served when federal agencies act within the bounds of their statutory authority. Congress enacted the Wild Horse and Burro Act to protect wild horses as living symbols of the historic and pioneer spirit of the West and to ensure their management as integral components of the public lands.

Likewise, NEPA reflects Congress's judgment that informed decision-making and public transparency are essential before federal agencies undertake actions with irreversible environmental consequences. Allowing the Forest Service to proceed with removals without complying with these statutory mandates would undermine the public's interest in lawful, accountable governance.

The HWHT is a designated public-lands area set aside for the protection and management of wild horses. The public has a direct and substantial interest in ensuring that these lands—and anywhere else in the ASNF that wild horses are presently found—are not altered irreversibly before the legality of the agency's actions can be reviewed. Once horses are removed from their congressionally designated territory, the loss is permanent. Preventing that irreversible outcome until the Court can assess the merits serves the broader public interest in stewardship of shared natural resources.

The public interest is also served by preserving the Court's ability to provide meaningful relief. If the Forest Service proceeds with removal actions now, the Court's eventual ruling on the merits may be rendered ineffective, regardless of outcome.

Finally, granting a Preliminary Injunction does not harm the public interest in effective land management. The requested relief is narrow and temporary. It does not

- 16 -

4922-9530-4615

permanently restrict the Forest Service's authority or foreclose future management actions that comply with the law. Instead, it ensures that any such actions occur only after the agency has satisfied its legal obligations and the Court has had an opportunity to review the challenged conduct. The public interest favors deliberate, lawful decision-making over rushed, irreversible action.

### IV.   <u>Plaintiffs Should Not Be Required to Post a Bond.</u>

This Court should not impose the security requirement here because doing so would effectively deny access to judicial review. *See Cal. Ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) (holding that court has discretion to dispense with te security requirement, or to request nominal security, where requiring security would effectively deny access to judicial review); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000). In particular, "[i]t is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Hualapai Indian Tribe v. Haaland*, 755 F.Supp.3d 1165, 1199 (D. Ariz. 2024) (quoting *Central Or. Landwatch v. Connaughton*, 905 F.Supp. 2d 1192, 1198 (D. Or. 2012)).

Plaintiffs, who are represented pro bono in this lawsuit, have demonstrated a strong likelihood of success on the merits, which "tips in favor of a minimal bond or no bond at all." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). Further, Plaintiffs should not be required to post a bond when "there is no realistic likelihood of harm to [Defendants] from enjoining [their] conduct." *Fornix Holdings LLC. v. Unknown Party*, 2022 WL 1619041, at * 2 (D. Ariz. May 23, 2022) (quoting *Barahona-Gomez v. Renno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

### V.   <u>Conclusion</u>

Accordingly, maintaining the status quo while the Court evaluates the legality of Defendants' actions is squarely in the public interest. Plaintiffs respectfully request that the Court immediately grant Plaintiffs' Motion for Preliminary Injunction for the reasons set forth above.

- 17 -

4922-9530-4615

DATED this 5th day of May, 2026.

SNELL & WILMER L.L.P.

By: *s/ Amanda Z. Weaver*
Anthony W. Merrill
Amanda Z. Weaver
John Habib
One East Washington St., Suite 2700
Phoenix, Arizona 85004-2556

*Attorneys for Plaintiffs*

- 18 -

4922-9530-4615