**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| International Society for the Protection of Mustangs and Burros, et al., | No. CV-26-08092-PCT-KML |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

After years of administrative proceedings, the United States Forest Service ("USFS") approved plans for the management of free-roaming horses in the Apache-Sitgreaves National Forests. (Doc. 1.) Not even three months later, USFS issued a notice claiming none of those horses qualified as protected by a federal statute and all of them could be removed. The International Society for the Protection of Mustangs and Burros ("ISPMB") and ISPMB member Betty Nixon filed a lawsuit and motion for a temporary restraining order to prevent any roundup. (Doc. 2 at 3.) The parties stipulated USFS would not round up horses until July 15, 2026. (Doc. 19 at 2.) Plaintiffs now move for a preliminary injunction that would primarily prevent any roundup while this litigation is pending. (Doc. 23-3 at 2.) A preliminary injunction is granted.

## I.    Factual Background

The Wild Free-Roaming Horses and Burros Act of 1971 ("WHA") protects "wild free-roaming horses and burros" from "capture, branding, harassment, or death." 16 U.S.C.

§ 1331. The WHA led to the establishment of the Heber Wild Horse Territory ("Heber Territory") in Arizona's Apache-Sitgreaves National Forests as "a range for the protection and preservation of wild horses." (Doc. 1 at 5.) The horses now at issue are found in the Heber Territory.

The statute defines "wild free-roaming horses and burros" as "all unbranded and unclaimed horses and burros on public lands of the United States." 16 U.S.C. § 1332(a). The relevant regulation, however, defines wild-free roaming horses and burros slightly differently, as "all unbranded and unclaimed horses and burros and their progeny that have used lands of the National Forest System on or after December 15, 1971." 36 U.S.C. § 222.60(13). Crucially, the regulatory definition excludes all horses or burros "introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership."[1] *Id.*

In 2005, ISPMB sued USFS to prevent USFS's plan to capture and sell around 120 horses from the Apache-Sitgreaves National Forests "without conducting a census, inventory, or environmental analysis." (Doc. 1 at 6.) The court granted a preliminary injunction preventing roundups. (Doc. 1 at 6.) In 2007, the parties came to a stipulated settlement agreement, which the court approved. (Doc. 1-1 at 11.) The stipulation required USFS to, among other things:

 a. Develop a territory management plan ("TMP") that complies with the National Environmental Policy Act ("NEPA"), with public involvement, before gathering or removing horses in the Heber Territory;

 b. Involve the public "in scoping for this analysis"[2];

 c. Consider the ISPMB's comments on the TMP; and

 d. Coordinate with the White Mountain Apache Tribe to repair and maintain the boundary fence, which had been damaged. (Doc. 1-1.)

---

[1] Though plaintiffs assert the statute does not require a genetic lineage from 1971, they do not contest the applicability of this regulation. (Doc. 33 at 10.)
[2] In this context, "scoping" likely referred to the process of "determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." *Nat'l Wildlife Fed'n v. Cosgriffe*, 21 F. Supp. 2d 1211, 1216 n.3 (D. Or. 1998) (simplified).

In January 2020, USFS published a proposal "initiating the scoping period" for a TMP. (Doc. 1 at 7.) In response, ISPMB submitted detailed comments and raised multiple concerns, including USFS's failure to notify the public about this proposal in violation of the 2007 Stipulation, reliance on incomplete data about the horses' population, and plan to provide only an Environmental Assessment ("EA") rather than a more-complete Environmental Impact Statement ("EIS") (Doc. 1 at 7-8). *See Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004) (under NEPA, agencies may prepare a shorter EA before deciding whether there is no significant impact on the environment or whether an EIS is required). Nixon also submitted comments on the proposal. (Doc. 1 at 8.) When USFS published the draft plan and accompanying EA, ISPMB again submitted similar comments and pointed out USFS's deviation from a relevant handbook. (Doc. 1 at 8-9.) Nixon also again submitted comments and objections. (Doc. 1 at 9.) In the summer of 2025, USFS published the final TMP and EA. (Doc. 1 at 9.) Both plaintiffs submitted formal objections to those documents, many of which were consistent with their previous comments. (Doc. 1 at 9-10.)

On January 29, 2026, USFS gave final approval to the TMP and EA. (Doc. 1 at 10.) It found the plan would have no significant impact on the environment and therefore did not require an EIS. (Docs. 1 at 10; 23 at 2, 5.) The TMP establishes an appropriate population management level ("AML") of 50-104 horses and authorizes population management actions to maintain that upper limit. (Doc. 1 at 10.)

The parties do not disclose what, if anything, occurred between January and April 2026, but on April 9 and 10, USFS issued a letter (Doc. 2-1 at 2-3) and subsequent notice (Doc. 2-1 at 5) declaring all of the horses in the Apache-Sitgreaves National Forests to be "unauthorized livestock" instead of wild free-roaming horses protected by the WHA. (Docs. 2-1 at 5; 1 at 10; 2 at 2.) USFS warned that as "unauthorized livestock," the horses could be "impounded without further notice" on or after April 27, 2026. (Doc. 2-1 at 5-6.) Impounded horses are to be sold at auction, including to locations where plaintiffs allege their slaughter is likely, and horses which are not sold at auction may be sold privately or

killed. (Doc. 1 at 13.) USFS's reclassification was not "supported by, disclosed in, or analyzed as part of" January's final TMP, Final EA, and finding of no significant impact. (Doc. 1 at 10; *see* Doc. 2-2 at 100, 8, 83.) Additionally, the letter begins by noting the 2007 stipulation "prohibited the removal of horses from the Sitgreaves National Forest regardless their status." (Doc. 2-1 at 2.) But without explaining further, the letter then states all the horses "currently found on the Sitgreaves National Forest are 'unauthorized livestock'" such that they can be removed.

Soon afterwards, plaintiffs filed a complaint alleging USFS violated the WHA, NEPA,[3] the Administrative Procedure Act ("APA"), and the 2007 Stipulated Settlement Agreement. (Doc. 1 at 13-24.) Plaintiffs also alleged that shortly after the April reclassification, third-party ranchers were seen trapping and removing a family of wild horses and "claiming verbal permission from [USFS]." (Doc. 23-2 at 2.)

Believing the April 27, 2026 date would trigger additional action by USFS or third parties, on April 22, 2026, plaintiffs filed a request for a temporary restraining order to delay the USFS roundup and prevent third parties from removing wild horses. (Doc. 2.) The parties then stipulated USFS would not round up horses until July 15, 2026 and would publish a notice stating third parties could reclaim their own private livestock in the area but could not remove non-privately-owned horses. (Doc. 19 at 2.)

Plaintiffs now move for a preliminary injunction that would prevent any USFS roundup in the area until USFS complies with certain procedural requirements and require USFS to "affirmatively enforce" the laws prohibiting third-party roundups. (Doc. 23-3 at 2-3.)

## II.    Legal Standard

Generally, a court analyzes a request for a preliminary injunction under two slightly-different tests. First, it must evaluate if there is a likelihood of success on the merits, if there is a likelihood of irreparable harm, whether the balance of equities tips in plaintiff's

---

[3] NEPA and WHA claims are litigated through the APA. *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014).

favor, and whether an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The court typically must also assess whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### III. Analysis

The court first addresses the breadth of plaintiffs' proposed injunction. In primarily asking the court to preserve the status quo by preventing roundups until USFS follows administrative procedures (Doc. 23-3 at 2-3), plaintiffs are requesting a prohibitory injunction. *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994). But plaintiffs' request that USFS "affirmatively enforce" laws prohibiting third party roundups (Doc. 23-3 at 2-3) would transform the proposed injunction into a mandatory one that will alter the status quo. *See Am. Freedom Def. Initiative v. King Cnty.*, 796 F.3d 1165, 1173 (9th Cir. 2015) (mandatory injunctions particularly disfavored). Agencies are afforded broad discretion regarding their decisions not to enforce. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985) ("an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion"). Accordingly, plaintiffs' request that any injunction mandate enforcement obligations for USFS must be denied.[4] That leaves the only issue as whether plaintiffs are entitled to an injunction stopping USFS from conducting roundups or authorizing third parties to do so, which can be analyzed under the less-stringent prohibitory injunction standard. *See Am. Freedom Def. Initiative*, 796 F.3d at 1173.

### A. Likelihood of Success and Serious Questions on Merits

Plaintiffs must show they are likely to succeed on their claims or, "at a minimum," they have raised serious questions on the merits of at least one claim. *All. for the Wild*

---

[4] USFS does not seem to take issue with maintaining the existing notice warning third parties against unauthorized removals (Doc. 20), so that notice can remain posted during the injunction's term.

*Rockies*, 632 F.3d 1127 at 1136; *see League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 n.3 (9th Cir. 2014). Serious questions are those that "cannot be resolved one way or the other at [a] hearing on the injunction" because they require "more deliberative investigation." *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (simplified).

Plaintiffs allege various claims under NEPA, the WHA, the APA, and a violation of the 2007 stipulation related to both the January 2026 TMP and the April 2026 reclassification letter. For present purposes, the most crucial claims involve whether the April 2026 letter violated the APA and NEPA (and therefore also likely the stipulation and WHA).[5] Because plaintiffs have shown they are likely to succeed on these claims as to the letter, the court need not analyze their other claims. *See League of Wilderness Defs.*, 752 F.3d at 767 (reversing denial of preliminary injunction where plaintiffs were likely to prevail on one claim).

The APA prohibits agencies from making "arbitrary and capricious" decisions, meaning their actions must be rational and within the agency's authority. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Though courts' review under that standard is narrow, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. at 43 (simplified). An agency acts arbitrarily and capriciously if it, among other things, "fail[s] to consider an important aspect of the problem" or offers an explanation contrary to the relevant evidence. *Id*. An agency also "may not depart arbitrarily from its own announced policies." *Bosma v. U.S. Dep't of Agric.*, 754 F.2d 804, 808 (9th Cir. 1984). Meanwhile, NEPA requires federal agencies to prepare an EA before implementing an action that may affect the environment; if the EA finds a proposed major federal action could "significantly affect" the environment, a more-

---

[5] USFS does not contest that the letter reflects a final agency action subject to judicial review. (*See* Doc. 30.) Because the letter appears to determine USFS's right to round up the horses, plaintiffs appear not to have non-judicial recourse to challenge its decision, and the letter has the legal consequence of reclassifying the horses, it very likely qualifies as a final agency action subject to judicial review. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (discussing requirements for final agency action).

detailed EIS is required. *Found. for Horses & Other Animals v. Babbitt*, 995 F. Supp. 1088, 1092 (C.D. Cal. 1998), *aff'd*, 154 F.3d 1103 (9th Cir. 1998); *see* 42 U.S.C. § 4332(2)(C). Agencies must analyze "every significant aspect of the environmental impact of a proposed action." *Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (simplified).

USFS argues it "undertook the public process contemplated by the stipulation" and NEPA before approving the January 2026 plan for the Heber Territory. (Doc. 30 at 5.) During that process, USFS only considered and analyzed in detail two potential plans: (1) not taking any action to manage the Heber Territory; and (2) developing a TMP to support the horses in the Heber Territory, including setting an appropriate AML and reducing the horse population to remain within that AML. (Doc. 2-1 at 30-31.) USFS chose the latter plan. True, the plan mentioned USFS would remove animals that did not meet the definition of a wild horse. (Doc. 2-1 at 50, 52.) But it also explicitly stated it considered and rejected a plan to set the AML to zero to reflect that the Heber Territory's current horse population includes no wild horses. (Doc. 2-1 at 28.) The EA stated USFS did not even analyze that rejected plan in detail because "there is no conclusive information from which to determine the horses on the Sitgreaves National Forest are not the progeny of wild free-roaming horses." (Doc. 2-1 at 28.) To sum up, USFS's assessment as of January 2026 was that an appropriate population level could not be zero because no conclusive evidence existed from which to determine whether the horses in the national forest qualified for protection under the WHA.

Just a few months after releasing that assessment, USFS's acting director issued a letter declaring "[his] conclusion" that *all* unclaimed horses in Sitgreaves National Forest are unauthorized livestock subject to removal. (Doc. 2-1 at 2-3; *see* Doc. 30-5 at 2 (describing approximately 2,000-horse population).) The letter bases that conclusion on "information presented in the record," specifically citing (1) 1993 correspondence regarding a low mare population, (2) a 1997 report to Congress providing a population count of zero horses from 1994-1996, and (3) a 2017 USFS ethnographic study that found

the Sitgreaves horses are not related to the original herd but escaped into the territory from neighboring areas. (Doc. 2-1 at 2.) USFS offers no explanation why that evidence, which all pre-dated the EA—sometimes by decades—was dispositive for the April status determination when it had not been for the January EA. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) ("the agency must, at a minimum, support its conclusions with studies that the agency deems reliable") (simplified).[6] Dramatic changes in agency policy like these usually require very clear explanations in justification. *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (agency must show it is aware it is changing position and explain why previous factual findings should be disregarded). But the April letter did not even mention the EA, let alone justify USFS's seismic position shift.

USFS argues the TMP and EA were limited only to a management framework for *protected* horses, if any exist, whereas the subsequent April 2026 status determination addressed "the distinct question" of the animals' status as wild horses. (Doc. 30 at 11.) Given the EA's statement that no conclusive information existed to allow a determination these were *not* protected horses, it is not clear how this question could be distinct. But even if it was, secretly conducting a post-EA "comprehensive review of the historical information and data provided by the public" during the EA's public-comment process (Doc. 30-1 at 2) would raise a host of other problems for USFS. *See Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 690 (N.D. Cal. 2020) ("explanation[s] . . . not publicly advanced by the agency at the time it reached its determination . . . constitute[] an impermissible post

---

[6] Additionally, the three documents on which the April letter relies do not appear particularly convincing, instead reflecting a pattern of USFS failing to provide methodology for its population counts. *See Friends of Animals v. Burgum*, 164 F.4th 738, 745 (9th Cir. 2026) (WHA requires current inventory of wild horses on public lands). For instance, the 1993 correspondence appears untrustworthy since USFS employees responsible for wildlife in the area admitted in depositions they did not know how its figure (among others) was derived. (*See* Doc. 33-3 at 3-8.) And there is no apparent methodology for the 1994-1996 population count, such that the judge in the 2005 litigation found USFS's numbers during that time period had "de minimis" evidentiary value. (Doc. 1-1 at 5.) Even in 2023, USFS in a FOIA response admitted there are *no* records regarding how USFS arrived at its population count (Doc. 1-1 at 35). Only the 2017 study includes methodology, and it shows researchers simply relayed ten individuals' sometimes-contradicting observations from the late 1990s and early 2000s, which were largely rebutted by a more-thorough 2006 study. (Docs. 33-3 at 143; 30-4 at 10-11.)

hoc rationalization"). If the documents on which the April letter relies were provided during public comment on the EA, the EA should have considered them before concluding there was not enough information available to determine the horses' status (Doc. 2-1 at 28). *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1070 (9th Cir. 2018) (requiring agency to provide "reasoned explanation" for change in position); *Organized Vill. of Kake*, 795 F.3d at 966 ("Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary and capricious change.") (simplified). For USFS to covertly conduct a second, "distinct" status analysis involving the immediate removal of 2,000 horses—an action the EA and TMP did not contemplate (Doc. 2-1 at 28)—without undergoing a public-comment process or studying its environmental effects would also likely violate NEPA. *See Baltimore Gas and Elec. Co.*, 462 U.S. at 97 (NEPA requires "every significant aspect of the environmental impact of a proposed action" to be analyzed) (simplified). And that does not even address whether an EA, rather than an EIS, would sufficiently support the removal of nearly 2,000 horses—a proposition that seems doubtful. *See In Def. of Animals v. U.S. Dep't of Interior*, 648 F.3d 1012, 1013 (9th Cir. 2011) (serious questions raised regarding whether 2,000-horse roundup requires EIS); *see also Am. Horse Prot. Ass'n, Inc. v. Andrus*, 608 F.2d 811, 814 (9th Cir. 1979) (without analyzing EIS requirement, noting "it cannot be denied" removing horses affects the human environment and a roundup in the thousands is more significant than one covering 400 horses).

Plaintiffs have therefore likely shown USFS's April letter violated NEPA and the APA. Flowing from that are serious issues regarding violations of the stipulation and WHA, because a failure to abide by NEPA procedures before attempting to remove wild horses violates both the stipulation's requirements[7] and the WHA's mandate to protect them.

---

[7] USFS appears to put little stock in its obligation to abide by the 2007 stipulation, arguing the stipulation "is not the law" and "is enforceable, if at all, only in the context of the original action." (Doc. 30 at 10.) That does not explain why the USFS is no longer bound by the stipulation, nor why it could not be enforced against them in this or another forum. The court need not address that issue in this order. *See League of Wilderness Defs.*, 752 F.3d at 767.

### B.  Likelihood of Irreparable Harm

Because plaintiffs have shown likely success on the merits on at least one of their claims, the court analyzes whether they have established a likelihood of irreparable harm. In providing significant evidence suggesting roundups by USFS or by USFS-authorized third parties will create irreparable harm to the herd, they have.

A lethal taking of an animal "is, by definition, irreparable." *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008). Plaintiffs argue a lethal taking is likely here: removed horses are often sold at auction to locations where they are slaughtered. (Doc. 23 at 15.) And if they are not sold at auction, they are either privately sold (after which "they cannot be tracked or recovered" and are likely transported to slaughter) or "destroyed or otherwise disposed of." (Doc. 23 at 15.) Plaintiffs support their argument with a declaration and quotes from ranchers in the area who appear involved in shipping "at least some of these horses to slaughter" (Docs. 33 at 13-14; 33-2 at 2), a declaration about the practice from an experienced horse preservationist (Doc. 23-1 at 2), and USFS regulatory language (Doc. 23 at 15). That evidence is sufficient to suggest at least some removed horses will be killed, which constitutes irreparable harm.

### C.  Balance of Equities and Public Interest

The third and fourth factors of the preliminary injunction test are a balance of equities, which weighs the burden to each party if an injunction is ordered, and a public-interest analysis, which weighs the injunction's impact on nonparties. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). These factors "merge into one inquiry when the government opposes a preliminary injunction." *Id*.

In balancing the equities, USFS argues an injunction would "leav[e] unauthorized livestock on the range to consume scarce forage and degrade habitat." (Doc. 30 at 17.) But it previously found "the abundance of forage was not identified as a limiting factor in" determining proper AML levels (Doc. 2-1 at 30), suggesting forage is not so "scarce" that an immediate roundup is necessary to prevent significant harm (Doc. 30 at 17). USFS also claims 21% of the horses are emaciated such that an environmentally-harmful population

crash may imminently occur (Doc. 30 at 17), but does not present evidence suggesting how—or when—the horses' emaciation may cause a population crash or even make clear how USFS arrived at the 21% number. In fact, USFS's own documents appear to show fewer than 21% are actually emaciated. (*Compare* Doc. 30-12 at 6 (horses with body condition score of 1 and 2 are emaciated) *with* Doc. 30-1 at 4 (21% of horses have body condition score of 1, 2, *and 3*).) Additionally, USFS only very recently labeled these horses unauthorized livestock and even then did not attempt to immediately begin rounding them up (*see* Doc. 10 at 1-2), further suggesting preserving the status quo is not likely to significantly burden USFS's interests. In contrast, plaintiffs have shown a likelihood of irreparable harm the moment a roundup begins. The balance of hardships therefore tips sharply in their favor.

Undoubtedly both USFS and the public have an interest in the government's lawful management of these lands. But plaintiffs have also shown the public interest tips in their favor, because the public has an interest in requiring the government to carefully follow administrative procedure and they are likely to show USFS violated NEPA and the APA. *See Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 279 (D.D.C. 1985), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987).

## IV.    Conclusion

Plaintiffs show a likelihood of success on at least one claim and a likelihood of significant and irreparable harm. The balance of hardships and public interest also weigh in their favor. Accordingly, the preliminary injunction is granted. It is granted as to all horses in the Apache-Sitgreaves National Forests rather than only the Heber Territory (Doc. 30 at 18), because that geographical range matches USFS's April reclassification of all Apache-Sitgreaves National Forests horses as unauthorized (Doc. 2-1 at 3).

Plaintiffs argue the court should not impose a security requirement because they are represented pro bono, *see Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1199 (D. Ariz. 2024), and there does not appear to be any legitimate financial harm to defendants. (Doc. 23 at 18.) USFS does not contest this (Doc. 30) and no security will be

ordered.

Accordingly,

**IT IS ORDERED** the Motion for a Preliminary Injunction (Doc. 23) is **GRANTED**.

During the pendency of this case,

1. Defendants, and their agents, employees, attorneys, and all persons acting in aid or concert with them, and all persons to whom knowledge of the same may come, are hereby restrained and enjoined from the following with respect to any unclaimed and unbranded horses found on the Apache-Sitgreaves National Forests:

(A) Determining horses to be "unauthorized livestock," "strays," or "feral" as opposed to federally-protected wild-free roaming horses; and

(B) Capturing or removing unclaimed and unbranded horses within the Apache-Sitgreaves National Forests.

2. Defendants shall keep public the existing notice regarding third-party roundups.

3. This order will remain in effect until a further order of this court provides otherwise.

Dated this 8th day of July, 2026.

_____
**Honorable Krissa M. Lanham**
**United States District Judge**